NOT FOR CITATION

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| CURTIS CARROLL,<br><br>                              Petitioner,<br><br>          v.<br><br>GEORGE M. GALAZA,<br><br>                              Respondent. | Case Number C 03-1636 JF<br><br>ORDER[1] DENYING PETITION FOR HABEAS CORPUS<br><br>[Docket No. 24] |

Petitioner Curtis Carroll, a state prisoner proceeding *pro se*, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his convictions for murder, attempted murder, and robbery.  Carroll raises the following claims for habeas relief: (1) the trial court erred in empaneling the jury over Carroll's repeated objections that the prosecutor improperly exercised peremptory challenges to dismiss African-American jurors; *see Batson v. Kentucky*, 476 U.S. 79 (1986); *People v. Wheeler*, 22 Cal.3d 258 (1978); (2) the trial court committed reversible error in its admission of the preliminary hearing testimony of Nakeyveyon Jones because the prosecutor failed to exercise due diligence to assure Jones's attendance at trial; (3) the trial court's refusal to

---

[1]          This disposition is not designated for publication and may not be cited.

1   grant Carroll's mistrial motion after the prosecutor deliberately elicited inadmissible testimony,

2   which raised an inference that Carroll had prior criminal convictions, violated Carroll's right to

3   due process; and (4) the cumulative effect of these errors violated Carroll's federal and state right

4   to due process.

5        Having considered the briefs and the relevant portions of the record, the Court will deny

6   the petition.

## I. BACKGROUND

8        The California Court of Appeal summarized the relevant facts as follows:

> In January 1996, Enrique Rodriguez was almost 16 years old and lived in apartment 302 at 1900 26th Avenue in Oakland with his parents, a brother and a friend named Gilberto Gil. On January 20, 1996, Rodriguez had accompanied Gil to the restaurant where Gil worked, Gil had cashed a check and the two had visited a friend. When they returned to the apartment building, after dark, it was raining heavily. Gil opened the front gate with his key and they climbed the stairs to a second door, which Gil also opened with a key. A black male about 16 years old, whom Rodriguez had seen around the building a few times, left as Rodriguez and Gil entered. Rodriguez subsequently identified the young man as Nakeyveyon Jones.
>
> As Rodriquez followed Gil up the next staircase, a group of about four young African-American men appeared from behind the stairs.[2]   They were all wearing dark colored jackets and pants and had their heads and faces partially covered with white cloth (except for one that was green or yellow), so that Rodriguez could see only their eyes, noses and cheeks. They appeared to be 16 to 20 years old, skinny and about 5'6" to 5'8" tall, although some could have been taller or shorter.[3]
>
> One of the group pointed a short barreled rifle at Rodriguez and said, "Break yourselves, mother fuckers."  Rodriguez noticed the person he had seen leaving the building come back inside and stand by the door, "like he was scared or something." Gil ran up the stairs and the man with the rifle chased him.  The others grabbed Rodriguez, made him walk to the landing, searched him and took his wallet, which contained less than $40.  They then told him to run, and Rodriguez ran to his apartment.  As he reached the third floor, he heard three or four gunshots.  He turned the corner to go to his apartment and saw the man with the rifle shooting Gil, who was lying on his stomach in front of the apartment door.  Rodriguez saw the man fire four shots in rapid succession.  The man turned, shot Rodriguez twice, in the left hand and right arm, then ran down the stairs. Rodriguez ran to the fire escape, watched the front door of the building until the police arrived and did not see

---

[2]      Rodriguez had told the police there could have been five or six persons in the group but testified that four was his "best estimate."

[3]      Rodriguez had told the police at the time of the incident that the men in the group were between 5'6" and 5'11" and that the one with the gun was about 5'11".

2

anyone leave the building.  About two minutes after a police officer arrived, the paramedics came and took Rodriguez to the hospital for treatment.

Rodriguez spoke to the police shortly after he arrived at the hospital, then again at about 3 a.m., and at his house about 10 days later.  He initially told the police officer he did not recognize any of the men but that the one he had seen leaving the building might have lived in the building.  At trial, Rodriguez testified that he knew co-defendant [Randy] Mouton from living in the building and that Mouton had been "a lot" shorter in January 1996. Rodriguez did not recognize Greene as living in the building.

Oakland Police Sergeant Thomas Swisher, who had retired by the time of trial, testified that he spoke with Rodriguez at about 2:30 a.m. on January 21.  Rodriguez was in a lot of pain from his gunshot wounds.  He told Swisher that he had looked out the fire escape door and had not seen the shooter leave the building, and that the shooter was about 5'8" tall.  On January 31, Swisher showed Rodriguez photographs of Mouton, Greene and Jones.  Rodriguez did not recognize Greene, said Mouton lived on the first floor of the building, and identified Jones as the person he saw leaving the building as he and Gil entered.

Transito Chavez, who lived in unit 110 on the first floor of the building, was outside smoking a cigarette about fifteen minutes before the shooting.  It was not raining.  Chavez was holding the door of the building open about a foot and he could see the whole lobby.  He observed four young men, about 5'6" to 5'7" and 130 to 140 pounds, enter the lobby, then walk toward the stairs and go up.  The group included Mouton, whom Chavez had seen around the building a number of times, and three others whom he had seen "once or twice" talking with Mouton.  They were dressed in dark clothing. Chavez returned to his apartment and about fifteen minutes later heard seven shots, with a gap of one to three seconds between some of the shots.  He then heard people running down from the second floor, followed by the sound of someone laughing and people gathering outside the apartment.  About a week after the shooting, Chavez was interviewed by the police and identified a photograph of Mouton.  He testified at trial that a photograph of Mouton showed one of the four people he had seen in the lobby and a photograph of Nakeyveyon Jones "could have been" one of the people.  He did not recognize a photograph of Greene as one of the people.

Oakland Police Officer Cynthia Espinoza arrived at 1900 26th Avenue at about 11:21 p.m. on January 20, 1996.  Two other officers were already at the front gate.  They banged on the gate until it was opened by Mouton.  There were five or ten people in the lobby, who directed the police to the third floor.  Espinoza found Gil lying on his stomach, unconscious, a little bit past unit 302.  Rodriguez was standing, holding his arm where he had been shot.  Espinoza took a brief statement from Rodriguez, who was then taken to the hospital by the paramedics.

Espinoza and other officers searched the hallway for evidence. Officer Jack Doolittle found eight expended .22 caliber casings in the hallway and near Gil's body, and two deformed bullet slugs under his body.  He also observed two strike marks, one in the wall near the doorway to apartment 302 and the other closer to the fire escape, that appeared to have been made by bullets fired from the direction of the staircase.  The strike marks appeared to be recent, but Doolittle had no way of knowing  when they were made. Doolittle found a wallet in Gil's pocket containing $342.

3

Espinoza and Doolittle were both at the scene for about four and a half to five hours. Four African-American youths in their late teens attracted their attention because they "continually" came up and down the stairs, going in and out of unit 315, "trying to get as close to the scene as possible; never asking any questions but seemed to be very interested in what was going on." Espinoza testified that of the group, Mouton appeared the most interested. Doolittle had a gunshot residue test kit available, but did not test any of the four; he testified that the test would be worthless if the suspect's hands had been washed.

Espinoza spoke with the four in the lobby and they identified themselves as Eric Greene, Curtis Lofton, Randy Mouton and Nakeyveyon Jones. Greene provided identification showing his name and address in San Leandro, and gave his birthdate as May 11, 1975. He was wearing a blue shirt and black jeans and was 5'10" and 140 pounds. The other three did not provide identification. Lofton gave his address as 1900 26th Avenue, unit 102, and his date of birth as August 5, 1976. He was wearing a dark blue jacket, red plaid shirt and black pants and was about 5'10" and 155 pounds. Mouton also gave unit 102 as his address, and gave a birth date of December 19, 1979. He was wearing a blue and gray cap, black leather jacket, blue shirt, black jeans, and appeared to be about 5'4" and 120 pounds. Nakeyveyon Jones gave his address as 2107 89th Avenue. He was wearing a blue multi-colored shirt and light blue jeans. In response to Espinoza's question, all four denied knowing anything about the shooting, although one said something about having heard gunshots.

Doolittle testified that the apartment building had one main door and two fire escapes. One fire escape led to the sidewalk, with a folding ladder that could be released for descent to the sidewalk; the other led to the courtyard. The fire escapes had unrestricted access to the building. The apartment manager testified that the courtyard was surrounded by a 10-foot fence, with a gate leading to 26th Avenue that was supposed to be kept locked. Police officer Bernard Thurman, who was also investigating the scene just after the shooting, testified that the ladder on the fire escape to the courtyard was not extended.

The manager of the apartment building testified that in January 1996, 22 of the 41 units in the building were occupied. Transito Chavez lived in unit 110 on the first floor. Three African-American males between the ages of 15 and 25 years lived in the building, one, a "heavyset guy" about 250 to 300 pounds, in unit 111, and two in unit 102. The manager often saw the taller of these two in apartment 212, which was rented to Maria Watson.

Police officers who canvassed the building shortly after 11:30 p.m. on January 20 were able to make contact people in 11 of the 38 apartments. These included Maria Watson, an approximately 20-year-old African-American in apartment 212, Dorothea Smith - Mouton's mother - an approximately 40-year-old African-American in apartment 102, and an African-American in apartment 314 who gave his name as Antoine Lofton and his birthdate as August 5, 1976. At trial, co-defendant [Curtis] Carroll's uncle testified that Carroll's father's name was Curtis Lofton and that Curtis Carroll's birthday was August 5, 1978. One of the officers, Bernard Thurman, noticed two or three young men going back and forth from the exterior of the building to apartment 102; at one point, one of the young men came from the direction of apartment 102 and put a bag into a dumpster. Thurman's subsequent search of the premises included the insides of the dumpsters.

4

Shawnique Peterson testified that on January 20, 1996, she was living in apartment 314 at 1900 26th Avenue with her two children. She had been "going out" with appellant Greene for about a year; he stayed with her two or three times a week and with his mother in San Leandro the rest of the time. Greene, Mouton and Carroll were close friends and spent "a lot" of time together. Carroll did not live at the building but Peterson saw him there every day. Mouton lived on the first floor of the building with his mother, Dorothea Smith.

Peterson had been in Mouton's apartment often and on one occasion before January 20 had seen two guns, one that looked like a rifle and one a "long gun" that looked like an "Army gun" or "machine gun." The latter had a "Banana Clip" that held "a lot" of bullets. The rifle was kept under a mattress and the other gun was kept wrapped in a sheet in a closet. The day Peterson saw the guns, she was in the apartment with the three appellants and Mouton and Carroll took the guns out. On December 31, 1995, Peterson was in her apartment with the three appellants and the three talked about celebrating New Year's by going to the roof of the building and shooting "the gun."[4]

On January 20, 1996, Peterson left the building around 5 or 6 p.m. to go to her mother's house. Before leaving, she went to Mouton's apartment and gave Greene a kiss goodbye. The three appellants were there, as well as a 14 or 15 year old with a "funny name" whom Peterson had not seen before. This teenager's name "might" have been Nakeyveyon.

Over the course of the evening, Peterson and Greene paged each other about every half hour, five or six times each. Greene's pages left Peterson's phone number except for the last page before Peterson returned to the building, which left Mouton's phone number. Peterson returned to the building at about 9:30 or 10 p.m. and saw police officers but not paramedics. Appellants and the teenager were in Peterson's apartment and remained there for about an hour, until Peterson got ready to go to bed. At that point, Mouton, Carroll and the teen-ager left and Greene stayed.

Peterson learned the next day that Greene had been arrested. Sometime after that, she was interviewed by the police at her house. The day following the interview, Mouton's brother Omar called her over to an apartment across the street, saying Carroll wanted to talk to her. Mouton had already been arrested by this time. Omar asked Peterson, "'what they say about "E,"'" and Peterson believed he was asking about Greene. She replied that "they was trying to pin him down for murder" and that this "wasn't right because he didn't do that." Peterson asked Carroll what had happened and Carroll said that he had shot the "Mexican guy." Peterson asked where the gun was and Carroll said he had it and was going to destroy or sell it and leave town.

Peterson acknowledged that when she first talked to the police she

---

[4]     Maria Munoz testified that on the afternoon of January 1, 1996, she heard a shot and then saw a "black" young man in the doorway to the courtyard of the building shoot a rifle three or four times. She subsequently picked Mouton's photograph from a line-up and at trial identified Mouton as the shooter.

Case No. C 05-0850 JF
ORDER DENYING PETITION FOR HABEAS CORPUS
(RSLC1)

told them Greene was alone in her apartment when she returned on the night of January 20 and that this was not true. Her relationship with Greene continued for about a year after this incident and she testified that she "really like[d] him." She testified that she liked Carroll, too, and did not get angry with him.

Peterson testified that at the time of the shooting Mouton was about 16 years old, Carroll was about the same age or older, Green was a few years older, and the teen-ager appeared to be a year or two younger than Mouton and Carroll. Peterson had never seen Greene hold a gun. Peterson acknowledged she was on probation for a misdemeanor battery which occurred on February 26, 1997.

Dorothea Smith, Mouton's mother, testified that Mouton and Carroll had been close friends throughout their lives. On January 20, 1996, she lived in her apartment with her fiancé and Mouton; the apartment had one bedroom and Mouton sometimes slept there and sometimes slept on the couch. Omar Smith sometimes stayed with her but often stayed with girlfriends. On March 20, 1996, police officers searched the apartment and found a rifle under the couch. She had never seen the rifle before and had never seen ammunition in the house or in Mouton's possession. On the evening of January 20, she was in her apartment when she heard the shooting and Mouton was there as well. Asked whether she had told the police on March 20 that she and Mouton were not at the apartment building when the shooting took place, she testified that she did not remember what she had told them and said, "I probably was drinking."

On March 20, 1996, Detective Thomas Swisher conducted a search of the apartment where Dorothea Smith and Mouton lived. Smith pointed to a couch in the front room as being where Mouton slept and to a closet where he kept his clothes. The police found a .22 rifle wedged between the springs and cushions of the couch, a shotgun shell on the floor behind the couch, and a bag under the couch containing a liquor box and a long sock that each contained .22 caliber ammunition. The liquor box held a 100-count box of "CCI .22 long rifle hallow point mini mag rounds," missing 15 or 16 rounds; the sock held five smaller boxes of "Thunderbolt brand .22 caliber ammunition." The police also found "CCI mini mag" .22 caliber rounds under the mattress in the bedroom, with some 83 missing from the 100-count container. In the closet, the police found seven 12-gauge shotgun shells. A .22 caliber casing was found on the floor in the front room. Dorothea Smith denied having any knowledge of weapons or ammunition in her home. In an interview about six hours after the search, Smith told Swisher that she, her boyfriend and Mouton had been out visiting her daughter on the evening of January 20, 1996, and that the shooting had already occurred by the time they returned to the building.

Lansing Lee, a criminalist with the Oakland Police Department, testified that the eight casings recovered from the homicide scene were .22 caliber, either "long" or "long rifle," manufactured by CCI. All eight were fired from the same firearm, which was not the rifle found in Mouton's apartment. The 12 casings recovered from the roof of the building were also CCI long or long rifle .22 caliber. Three of these 12 casings were fired from the same firearm that fired the ones at the homicide scene; six were fired by the firearm found in Mouton's apartment; and three were fired by a third firearm.

6

Mouton was arrested on March 20, 1996; Greene was arrested on March 21, 1996, and Carroll was arrested on April 9, 1996.

Criminalist Jennifer Hannaford testified that a fingerprint on the liquor box found in Mouton's apartment belonged to Carroll. A fingerprint on the underside of the lid of the cartridge box found in Mouton's apartment belonged to Mouton.

Swisher interviewed Nakeyveyon Jones on March 18, 1996, as a witness, because Jones had been seen leaving the building just before the shooting. Jones first denied knowing anything about the shooting and said he had never been at an apartment house at 26th and Foothill. After Swisher showed him a witness sheet from the crime report that listed his name and a photo lineup containing his photograph, Jones "remembered being at the scene the night of the shooting." Jones said he had been with appellants before the shooting and had left the building because he "didn't want any part of the robbery that had been planned." He said he had seen two Hispanics come into the building as he left. After the shots were fired, Mouton's mother let Jones back into the building and told him to go to the second floor, where the other young people were. He went back inside the building, after the shots were fired. Swisher characterized the interview of Jones as "low-keyed," with no yelling and no threats. Nakeyveyon Jones was not available to testify at trial and his preliminary hearing testimony was read into the record over appellants' objections. Jones testified that on the evening of January 20, 1996, he left his house with his friend Chris, Carroll, Omar Smith and "some females" in Chris' car. Chris drove to the store and the girls got out and bought some chips. The group then continued to Mouton's mother's apartment, where Mouton's mother let them in; Mouton was there.

At another point in his testimony, Jones said that Mouton had been with him, Carroll, and the girls when they first came to the building. Jones testified that on the way into the building, some boys had given them some trouble and one had said he was going to shoot Jones. He testified that he went to get Mouton, who came out with a rifle and then returned inside.

After about 10 minutes, Chris and Omar left. Jones wanted to leave but Omar told him to stay. Jones saw Mouton jump on top of the refrigerator and pull two rifles from behind it, look at them and put them back. Carroll and Mouton talked about having shot the gun "on New Year's."

Jones initially testified that he, Mouton and Carroll went upstairs to Greene's apartment and watched television for about 10 minutes, then Jones and Carroll returned to Mouton's apartment and continued talking with the girls, after which Greene and Mouton came back to the apartment and the girls left to go to the club "Faces." At another point in his testimony, Jones stated that he remained downstairs while the girls were there and did not go upstairs with the others until after the girls left. After the girls left, Jones and the three appellants went back to Greene's apartment and Mouton suggested going to a club called "Faces."[5] Carroll suggested they rob someone and Mouton and Greene agreed; Jones did not want to and appellants called him names. Mouton got a gun which he and Carroll told Jones was not loaded: Jones testified first that the group went back to Mouton's apartment and Mouton came out with a rifle that he "pointed around," then later testified

---

[5]      Jones had not met Greene before this evening.

that he remained upstairs in Greene's apartment when Mouton went downstairs and got the gun.  Appellants put on masks made from tee shirts.  Jones wanted to go home.  He testified initially that Carroll told him not to leave because "we had got into it with some boys downstairs," and later that he was scared to go outside because there were "some boys I had problems with down there that said they was going to shoot me."

In any event, Jones left.  He testified at one point that when he left Mouton was holding the gun and at another point that when he left Mouton had handed the gun to Carroll.  As Jones left the apartment building, he saw two Mexican men entering.  Jones went to the corner, looking for a bus to go home, but there was not one coming.  A minute after seeing the men enter the building, he heard gunshots and ran back inside.  He went to Mouton's apartment and knocked but there was no answer, so he went upstairs to a girl's apartment he had previously been to with Carroll.  An "old lady" opened the door and Jones saw appellants and a girl there.  Appellants were breathing fast and talking about the robbery.  Carroll was rummaging through "the wallet."  Jones saw a piece of paper with Spanish words on it fall from the wallet.  Jones saw someone put the gun under the bed and appellants told Jones, "don't say nothing."  Jones was scared and called his mother and father to pick him up but neither was able to.  Someone knocked on the door and Greene told Jones not to answer it and went into a closet.  Jones testified that Greene's girlfriend came into the apartment after the shooting, although he indicated this occurred in Greene's apartment.

Later, Mouton went downstairs, followed by Jones and Carroll and then Greene.  They were stopped by the police, who asked for their names.  Carroll gave a fake name.  Appellants went to the store, then returned to the building; Mouton and Greene went inside and Jones and Carroll left.  On the way home, Carroll told Jones not to tell anyone anything and Jones was scared, thinking "probably he was going to shoot me."  Subsequently, Jones saw Carroll when Carroll came to see Jones' cousin and Carroll told Jones, "I never thought I could pull a trigger like that."

Jones acknowledged that he had been arrested for driving a stolen car with a gun in it, and that he was on probation.  He had also been found in possession of cocaine, although he claimed some other boys had "put it on [him]."  Jones testified that when he was interviewed by the police a couple months after the shooting, he first lied because he was scared, then told the truth.  Appellants did not testify.

Respondent's Ex. C (Unpublished Opinion of the California Court of Appeal, First Appellate District, *People v. Mouton*, A090842, Jan. 31, 2002) at 2-13.

Appellants were charged with the murder of Gilberto Medina Gil (Cal. Pen. Code § 187); attempted murder of Enrique Rodriguez (Cal. Penal Code §§ 187, 664); robbery of Enrique Rodriguez (Cal. Penal Code § 211) and attempted robbery of Gilberto Medina Gil (Cal. Penal Code §§ 211, 664).  It was alleged that Carroll personally used a rifle (Cal. Penal Code §§ 1203.06, 12022.5) and that Greene and Mouton were armed with a rifle (Cal. Penal Code §

8

1   12022(d)) in the commission of the first three charged offenses; that Carroll personally inflicted

2   great bodily injury (Cal. Penal Code § 1203.075) in the commission of the murder; and that

3   Greene previously had been convicted of felony possession of narcotics.  The fourth count

4   (attempted robbery) and the great bodily injury enhancement subsequently were dismissed.

5        An Alameda Superior Court jury convicted Carroll of first degree murder, attempted

6   murder, and robbery.  The jury found true the allegations that Carroll personally used a rifle and

7   found not true the allegations that Greene and Mouton were armed with a rifle during the

8   commission of the offenses.  On March 17, 2000, Carroll was sentenced to a prison term of fifty-

9   four years to life.[6]  Carroll appealed his conviction, which the state appellate court affirmed on

10  January 31, 2002.  The California Supreme Court denied a petition for review on May 1, 2002.

11       On April 23, 2003, Carroll filed a federal habeas petition.  On February 6, 2004, this

12  Court ordered Respondent to show cause why the petition should not be granted.  Respondent

13  moved to dismiss the petition for failure to exhaust state remedies, and Carroll filed an

14  opposition.  On March 28, 2005, the Court granted Respondent's motion to dismiss the petition,

15  with leave to amend.  Carroll thereafter filed an amended petition containing his two exhausted

16  claims and a motion to stay the amended petition while he returned to state court to exhaust his

17  remaining claims.  On April 28, 2005, the Court granted Carroll's motion to stay.  Carroll then

18  filed a habeas petition in the California Supreme Court, which was denied summarily on March

19  29, 2006.  Thereafter, on June 12, 2006, Carroll filed the operative second amended petition in

20  this Court.  On July 12, 2006, the Court ordered Respondent to show cause why the second

21  amended petition should not be granted.  Respondent his answer on November 9, 2006, and

22  Carroll filed a traverse on May 25, 2007.

23                              **II.  LEGAL STANDARD**

24       This Court will entertain a petition for "writ of habeas corpus in behalf of a person in

25  custody pursuant to the judgment of a State court only on the ground that he is in custody in

26

27       [6]     On March 7, 2000, Mouton and Greene each were sentenced to a prison term of
      twenty-five years to life on count one, with concurrent upper terms of nine years on count two
28  and six years on count three.

                                        9

1  violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  The

2  court may not grant a petition with respect to any claim that was adjudicated on the merits in

3  state court unless the state court's adjudication of the claim: "resulted in a decision that was

4  contrary to, or involved an unreasonable application of, clearly established Federal law, as

5  determined by the Supreme Court of the United States[.]" *Id*. § 2254(d)(1).

6        "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court

7  arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if

8  the state court decides a case differently than [the] Court has on a set of materially

9  indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  "Under the

10  'unreasonable application clause,' a federal habeas court may grant the writ if the state court

11  identifies the correct governing legal principle from [the] Court's decisions but unreasonably

12  applies that principle to the facts of the prisoner's case." *Id*. at 413.  "[A] federal habeas court

13  may not issue the writ simply because the court concludes in its independent judgment that the

14  relevant state court decision applied clearly established federal law erroneously or incorrectly.

15  Rather, that application must also be unreasonable." *Id*. at 411.

16        A federal court making the "unreasonable application" inquiry in a habeas case should ask

17  whether the state court's application of clearly established federal law was "objectively

18  unreasonable." *Id*. at 409.  The "objectively unreasonable" standard does not equate to "clear

19  error" because "[t]hese two standards . . . are not the same.  The gloss of clear error fails to give

20  proper deference to state courts by conflating error (even clear error) with unreasonableness."

21  *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (citation omitted).  This standard of review,

22  however, does not relieve a federal court of review from its duty to examine and analyze the state

23  court's application of federal law.

24        A federal habeas court may grant the writ it if concludes that the state court's adjudication

25  of the claim "resulted in a decision that was based on an unreasonable determination of the facts

26  in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  The

27  court must presume correct any determination of a factual issue made by a state court unless the

28  petitioner rebuts the presumption of correctness by clear and convincing evidence. *Id*. §

10

1   2254(e)(1).

2   **III.  DISCUSSION**

3   A.   *Wheeler/Batson* Claim

4   Carroll first alleges that the trial court committed reversible error when it denied defense

5   motions for a mistrial pursuant to *Batson* and *Wheeler*.  A criminal defendant has a constitutional

6   right to a fair and impartial jury pool composed of a cross section of the community.  *See Taylor*

7   *v. Louisiana*, 419 U.S. 522, 538 (1975); *Duncan v. Louisiana*, 391 U.S. 145, 148-58 (1968).  The

8   Sixth Amendment's fair cross-section requirement does not prevent either side from exercising

9   its peremptory challenges in order to exclude cognizable groups from a jury that is impaneled; it

10  requires only an impartial, not a representative, jury.  *See Holland v. Illinois*, 493 U.S. 474, 480

11  (1990).  For example, there is no per se violation of the Sixth Amendment right to a jury

12  composed of a fair cross-section of the community anytime the effect of a prosecutor's use of

13  peremptory challenges has the effect of excluding African-Americans.  *See Batson*, 476 U.S. at

14  84 n.4;  *Weathersby v. Morris*, 708 F.2d 1493, 1497 (9th Cir. 1983).

15  At the state level, peremptory challenges may not be exercised for the purpose of

16  excluding members of a particular group.  *Wheeler*, 22 Cal. 3d. at 276-77; *see Batson*, 476 U.S.

17  at 85-86.  African-Americans are a cognizable group under both *Wheeler* and *Batson*.  *People v.*

18  *Catlin*, 26 Cal. 4th 81, 116 (2001).  In order to prevail on a *Wheeler/Batson* motion, a party must

19  "raise a timely objection and make a prima facie showing that one or more jurors has been

20  excluded on the basis of group or racial identity."  *People v. Jenkins*, 22 Cal.4th 900, 993 (2000).

21  Under *Batson*, the moving party must "raise an inference" that a juror was excluded on an

22  impermissible basis.  If a prima facie case is made, the burden shifts to the non-moving party to

23  demonstrate genuine nondiscriminatory reasons for the challenge or challenges.  *Id*.  While

24  challenges based on group bias are forbidden, "passivity, inattentiveness, or inability to relate to

25  other jurors . . . [are] valid, race-neutral explanations for excluding jurors."  *United States v.*

26  *Changco*, 1 F.3d 837, 840 (9th Cir. 1993) (citations omitted).  Additionally, challenges based on

27  attorney distrust of a juror's responses on a juror questionnaire or to direct question have been

28  upheld as legitimate.  *See Stubbs v. Gomez*, 189 F.3d 1009, 1105-07 (9th Cir. 1999).

11

1     On appeal, the disposition of a *Wheeler* motion is reviewed with great restraint, as the

2  trial judge's determination is a factual one, and as long as "the trial court makes a 'sincere and

3  reasoned effort' to evaluate the nondiscriminatory justifications the prosecution offers, the court's

4  conclusions are entitled to deference on appeal if supported by substantial evidence." *People v.*

5  *Ervin*, 22 Cal.4th 48, 74-76 (2000) (citation omitted).  The findings of the state appellate court

6  will be disturbed on habeas review only if they are "contrary to, or involved an unreasonable

7  application of, clearly established Federal law, as determined by the Supreme Court of the United

8  States," 28 U.S.C. § 2254(d)(1), or "[were] based on an unreasonable determination of the facts

9  in light of the evidence presented in the State court proceeding." *Id*. § 2254(d)(2).

10     In Carroll's case, the prosecution exercised a total of seventeen[7] peremptory challenges,

11  eight of which were directed toward African-Americans.[8]  Ex. C at 14.  Carroll claims that seven

12  of these peremptory challenges were made improperly on the basis of race.[9]  *Id*.  The final jury

13  composition included two African-Americans.  *Id*.

14     During jury selection, Carroll moved for a mistrial several times.  Carroll first made a

15  *Wheeler* motion after the prosecutor's sixth peremptory challenge, claiming that three of the

16  prospective jurors had been excused because they were African-American.  Ex. C at 14.  The trial

17  court denied the motion.  The *Wheeler* motion was renewed after the ninth, thirteenth, fifteenth

18  and seventeenth peremptory challenges.  Ex. C at 15. While it found that Carroll had failed to

19

20

21     [7]     The prosecutor claimed that he exercised eighteen challenges; the record reflects
    seventeen.  Ex. C at 14, n.9.

22

23     [8]     The prospective jurors excused were James B., Vera P., Abubakar B., Deborah N.,
    Getahun B., Shirley G., Carey M., Melba B., Jose Y., Cynthia I., John. J., Syreeta D., Claire N.,
    Charles B., Cassandra V., and Artena P.  Although the appellate court states seventeen jurors

24  were excused, the decision only lists the names of the above sixteen jurors.  Ex. C at 14, n.10.

25     [9]     Carroll asserts that the prosecutor removed *eight* African-American jurors.
    However, the appellate decision notes that Carroll did not "challenge the removal of one of the

26  eight African-American Jurors, Syreeta D.  At trial, the defense tried unsuccessfully to have
    Syreeta D. removed for cause, arguing that she did not have 'a grasp of what's going on.'  The

27  prosecutor excused her because she was 'not very bright' and the prosecutor was concerned about
    her ability to understand the

28  case . . . ."  Ex. C at 14, n.11.

12

1  establish a prima facie case under *Wheeler*[10] because two African-Americans remained on the

2  jury, the trial court nonetheless did require the prosecutor to explain his reasons for excusing the

3  seven prospective African-American jurors.  Ex. C at 15.

4       Respondent contends that the prosecutor exercised the peremptory challenges in good

5  faith for race-neutral reasons and that the challenges were not applied inconsistently to minority

6  and non-minority jurors.  The state appellate court reviewed the prosecutor's explanations and

7  concluded that the prosecutor had stated plausible, non-discriminatory race-neutral reasons for

8  striking the jurors in question.  Ex. C at 27.

9       1.    Vera P.

10       The prosecution excused Vera P. because she "admitted that she [had] been convicted of

11  a moral turpitude crime . . . [of] credit card fraud.  She was in possession of a stolen credit card."

12  Ex. C at 18.  The prosecution believed that Vera P.'s conviction of a crime of moral turpitude

13  rendered her unsuitable as a juror in a criminal case.  Additionally, the appellate court noted that

14  Carroll never argued that Vera P.'s prior conviction was an invalid reason for a peremptory

15  challenge.  Instead, Carroll attacked the prosecutor's sincerity by pointing out that two Caucasian

16  jurors were not challenged even though they had been arrested in the past.  Ex. C. at 19.

17       The appellate court rejected Carroll's argument, stating:

18       The California Supreme Court has repeatedly rejected "a procedure that places
        an "undue emphasis on comparisons of the stated reasons for the challenged
19       excusals with similar characteristics of nonmembers of the group who were not
        challenged by the prosecutor," noting that such a comparison is one-sided and
20       that it is not realistic to expect a trial judge to make such detailed comparisons
        midtrial.' (*People v. Turner*, *supra*, 8 Cal.4th 137, 169, quoting *People v.*
21       *Johnson*, 47 Cal.3d 1194, 1220-21 (1989)."  (citations omitted) . . . .  Here, the

22

23       [10]     In *Johnson v. California*, 545 U.S. 162, 168 (2005), the United States Supreme
        Court held that the proper standard for judging whether a prima facie case has been made is the
24       *Batson* "inference" standard, not California's *Wheeler* standard of "more likely than not."
        However, a federal habeas court need not dwell on the first step of the *Batson* analysis if the
25       matter has proceeded to the second or third step.  "Once a prosecutor has offered a race-neutral
        explanation for the peremptory challenges and the trial court has ruled on the ultimate question of
26       intentional discrimination, the preliminary issue of whether the defendant has made a prima facie
        showing becomes moot."  *Hernandez v. New York*, 500 U.S. 352, 359 (1991); *cf. Stubbs*, 189
27       F.3d at 1104 (appellate court would not consider whether a prima facie showing had been made;
        question was mooted by habeas evidentiary hearing at which prosecutor first explained his
28       peremptory challenges and district court found them to be race-neutral).

> comparison between Vera P.'s conviction of an offense related to use of a stolen credit card and the prior arrests of Trial Jurors Nos. 7 and 8 simply does not work.  Whatever the explanation Vera P. offered, she pled no contest to an offense involving moral turpitude.  Juror No. 7 had never been convicted of any offense but had been falsely arrested as a teenager . . . . Similarly, Trial Juror No. 8, an epileptic, had been arrested in the 1960's because the police thought he/she was drunk and disorderly . . [the prosecution believed] nothing in [their] experience might affect his/her ability to be fair and impartial.

Ex. C at 19-20.  The appellate court therefore concluded that the prosecutor stated plausible, non-discriminatory reasons for excusing Vera P.

2.   Abubakar B.

The prosecution excused Abubakar B. for several reasons.  The first reason was that Abubakar B. was a social director of an after school program for underprivileged children, a fact that the prosecutor believed might cause him to "have a more forgiving attitude towards these three defendants because the very nature he does work for, folks come from a similar background as these three defendants."  Ex. C at 21.  Carroll argues that the prosecutor's comment reflects an improper reason for the peremptory challenge.  However, the state appellate court found the prosecutor's belief that Abubakar B. might be more sympathetic towards Carroll because of his occupation was racially neutral.  The court noted that just because Abubakar B. "stated he would not be influenced by sympathy based on [Carroll's] age did not preclude the prosecutor from drawing a different inference."  Ex. C at 21.

Second, the prosecutor excused Abubakar B. because he was one of the jurors who laughed sarcastically when asked if he would believe the police officers' testimony and also because he failed to answer six questions on the juror questionnaire including "innocuous questions, about, for example, his kids and things of that nature."  Ex. C at 21.  Challenges based on attorney distrust of a juror's responses on a juror questionnaire or to direct question have been upheld as legitimate and race-neutral.  *Stubbs*, 189 F.3d at 1105-07.  The appellate court therefore concluded that Carroll's claim as to Abubakar B. was without merit.  Ex. C at 22.

3.   Getahun B.

Getahun B. indicated that Carroll's age might affect his ability to reach a guilty verdict even if he believed Carroll was guilty beyond a reasonable doubt.  Carroll contends that this was

14

an insufficient basis for the prosecutor's peremptory challenge, because Getahun B. "ultimately stated he would follow the law" despite the difficulty he might experience doing so.  Ex. C at 22.

The prosecutor stated adequate reasons for excusing Getahun B. "He [Getahun B.] was not sure whether he could [find Carroll guilty due to his age] . . . I can't take that chance.  I need someone who is going to say adamantly that is not an issue."  Ex. C at 22.  The appellate court concluded that the prosecutor's explanation was satisfactory and that the record provided no basis for Carroll's argument that the exclusion of Getahun B was based on race.

4.   Shirley G.

The prosecutor excused Shirley G. because her responses about her past experiences with the police, including having been falsely arrested and having witnessed a friend being beaten by police officers, suggested a "degree of anger and hostility."  Ex. C at 23.  Carroll contends that although Shirley G. "readily admitted" her negative experiences with police officers, she did not express present hostility towards the police or unwillingness to follow the law.  Ex. C at 23.  Additionally, Carroll argues that the prosecutor's explanation must have been contextual because Trial Jurors No. 7 and No. 8, who were not African-Americans, were not excused despite their past false arrests and negative experiences with the police.  Ex. C at 23.

The state appellate court determined that the prosecutor's reason for excusing Shirley G. was "inherently plausible and supported by the record."  Ex. C at 24 (quoting *People v. Silva*, 25 Cal.4th 345, 386 (2001)).  It noted that the prosecutor also had excused James B., a Caucasian prospective juror who had a past negative experience with police officers and that the prosecutor had not challenged Trial Jurors No. 7 and No. 8 because both had affirmatively stated that their prior arrest experiences did not cause them to harbor any ill will towards the police and because they believed they could be fair and impartial jurors.  Ex. C at 23.

5.   Melba B.

The prosecutor excused Melba B. for two reasons.  First, Melba B. was eighty years old and had arthritis, which she indicated in her questionnaire "might physically cause her to be unable to sit as a juror."  Ex. C at 24.  The prosecutor felt that Melba B.'s arthritis "might cause inconvenience and might interfere with the juror's concentration."  Ex. C at 25.  Carroll's claims

15

that the prosecutor's concern that Melba B's arthritis would inhibit her from walking up and down the courthouse stairs was irrelevant because the courthouse had elevators, and thus her condition did not impact Melba B.'s ability to perform as a "fair, impartial juror." Ex. C at 24.  The appellate court rejected Carroll's argument, stating that "[a] concern that a juror might be uncomfortable, be caused inconvenience or cause inconvenience to others in a lengthy trial is a race-neutral reason for exercising a peremptory challenge and [the] trial court was entitled to accept it as genuine." Ex. C at 25.

Second, the prosecutor asserted that former school teachers such as Melba B. tend to be liberal and "forgiving of children," a reason supported by California case law.  Ex. C at 24; *see People v. Barber*, 200 Cal.App. 3d 378, 394 (1988).  Carroll points out that the prosecutor did not challenge Trial Juror No. 3. a non-African-American school teacher, thus raising, as the appellate court acknowledged, "some question as to the legitimacy of the prosecutor's explanation in this case." Ex. C at 25.  However, the appellate court deferred to the trial court's finding that the prosecutor had stated race-neutral reasons for excusing Melba B., noting the record on appeal "does not reflect what level of education Melba B. taught, or for how long, making it difficult to compare the likelihood of her being sympathetic toward [Carroll] against the likelihood of such sympathy from Juror No. 3, who had only recently begun to work as a teacher's assistant with preschool-age children." *Id.*

6.   Charles B.

The prosecutor excused Charles B. because he believed Charles B. was "a little bit off, a little bit weird," noting that when the clerk called his name "he approached and said 'that's Charles [B.] Senior, in kind of a cavalier way.  Not Charles [B.] Junior.'" Ex. C at 25.  The prosecutor felt that Charles B.'s apparent attitude could cause conflict with the other jurors.  *Id.* Additionally, the prosecutor was "'greatly' concerned with Charles B.'s comment that his daughter had been 'falsely accused of driving while Black' and that this 'happens frequently in society,' which 'implied a bias against police.'" Ex. C at 26.  The prosecutor also noted that Charles B. had worked with the food stamp program, which suggested a "more forgiving attitude of someone who might have been in a social or impoverished state." Ex. C at 26.  While

16

1   acknowledging that Charles B. stated that he could be impartial, the prosecutor did not want to

2   "take any chances."  Ex. C at 26.

3          Carroll contends Charles B. was not "weird," because his comment that he was "Charles

4   [B.] senior" not "junior" stemmed from the fact that Charles B. Junior, his son, was sitting as a

5   juror in one of the other courtrooms the same day.  Ex. C at 26.  Carroll also argued Charles B.'s

6   prior experience as a juror and the fact his son had been a robbery victim made him a good

7   choice.  *Id*.  The appellate court rejected Carroll's arguments:

8               the prosecutor was entitled to act on his feeling [that Charles B. was weird] as
             long as it was not based on Charles B.'s race.  Moreover, this was not the only
9            reason the prosecutor offered for excusing Charles B.  As indicated above, the
             prosecutor's impression that a person whose occupation involved the provision
10           of social services might tend to be sympathetic to defendants from an
             impoverished background constitutes a race-neutral reason for a peremptory
11           challenge. [*People v. Trevino*, 55 Cal. App. 4th 396, 411-12.] Moreover, although
             Charles B. stated he would judge the police officers' credibility the 'same way' as
12           anyone else's, he acknowledged [some skepticism in his ability to do so] . . . .

13   Ex. C at 26.

14          7.    Artena P.

15          The prosecutor excused Artena P. for three reasons.  First, she had cerebral palsy, the

16   physical symptoms of which concerned the prosecutor because of the possible "distractions

17   caused by physical issues, as well inconvenience to everyone if Artena P. could not climb stairs

18   and the possibility of having to reconstitute the jury if Artena P. had to be excused during trial."

19   Ex. C at 27.  Second, the prosecutor expressed a desire for a juror who showed no indication of

20   wavering in her decision or who was inclined to "sympathize with the defendants due to their

21   age."  *Id*.  Finally, the prosecutor believed Artena P. seemed too "timid and very soft spoken."

22   *Id*.  Carroll contends that the prosecutor's reason for excusing Artena P. because of his belief she

23   lacked "decision-making and managerial skills" was inconsistent with excusing both Abubakar

24   B. and Charles B., who appeared to possess such skills.  Ex. C at 27.

25          The state appellate court found that the prosecutor's concern regarding Artena P.'s

26   physical inability to sit for the trial was race-neutral and that the prosecutor stated "other valid

27   reasons for excusing Abubakar V. and Charles B. which were accepted by the trial court."  Ex. C

28   at 27.  Indeed, while challenges based on group bias are forbidden, "passivity, inattentiveness, or

17

1  inability to relate to other jurors . . . [are] valid, race-neutral explanations for excluding jurors."

2  *See Changco*, 1 F.3d at 840.

3      Based on the foregoing analysis, the state appellate court concluded that the trial court

4  properly denied Carroll's *Wheeler/Batson* claims because Carroll had failed to prove that the

5  prosecutor's reasons for the peremptory challenges were "either inherently implausible or

6  unsupported by the record." Ex. C at 27.  The trial court evaluated the prosecutor's proffered

7  reasons in light of  the totality of the circumstances in determining that Carroll failed to meet his

8  burden of proving purposeful discrimination.  *Batson*, 476 U.S. at 98; *Mitleider v. Hall*, 391 F.3d

9  1039, 1047 (9th Cir. 2004); *Lewis v. Lewis*, 321 F.3d 824, 831 (9th Cir. 2003);  *Wade v. Terhune*,

10 202 F.3d 1190, 1195 (9th Cir. 2000).  The empaneled jury contained two African-Americans.

11 Although this last fact is not conclusive evidence proving non-discrimination, "it is an indication

12 of good faith in exercising peremptories, and an appropriate factor for the trial judge to consider

13 in ruling on a *Wheeler* objection.  *People v. Turner*, 8 Cal.4th at 168."  Ex. C at 27-28 (citation

14 omitted).

15     Based on its independent review of the record, this Court concludes that the state

16 appellate court's decision was neither contrary to or an unreasonable application of federal law

17 nor based on an unreasonable determination of the facts in light of the evidence presented in the

18 state court proceeding.

19 B.     Jones's Preliminary Hearing Testimony

20     Carroll next alleges that the trial court deprived him of his constitutional rights to

21 confrontation and cross-examination when it determined that Naykeyvon Jones, a crucial

22 prosecution witness, was unavailable and admitted Jones's preliminary hearing testimony into

23 evidence at trial.  Carroll also contends that the prosecution failed to exercise reasonable

24 diligence to ensure Jones's appearance at trial.

25     The Confrontation Clause of the Sixth Amendment provides that in criminal cases the

26 accused has the right to "be confronted with witnesses against him."  U.S. Const. amend. VI.

27 The federal right applies to the states through the Fourteenth Amendment.  *See Pointer v. Texas*,

28 380 U.S. 400, 403 (1965).  In *Crawford v. Washington,* 541 U.S. 36 (2004), decided after Carroll

18

filed the instant petition, the Supreme Court partially overruled *Ohio v. Roberts*, 448 U.S. 56
(1980).  Although *Whorton v. Bockting*, 127 S.Ct. 1173, 1177 (2007), held that Crawford is not
retroactively applicable in federal habeas proceedings, *Danforth v. Minnesota*, 128 S.Ct. 1029,
1040-41 (2008), clarified that the rule of nonretroactivity for federal habeas proceedings is not
binding on state habeas courts.  *Delgadillo v. Woodford*, 527 F.3d 919, 922 (9th Cir. 2008).
Because the California Court of Appeal rendered its decision in this case under *Ohio v. Roberts*,
448 U.S. 56 (1980), the governing standard is *Roberts*, not *Crawford*.

  For the cases governed by pre-*Crawford* law, such as this one, the basic rule is:

> [A]n out-of-court statement against a criminal defendant was admissible at trial if
> two conditions were met.  First, 'in order to introduce relevant statements at trial,
> state prosecutors [must] either produce the declarants of those statements as
> witnesses at trial or demonstrate their unavailability.  Second, even if prosecutors
> succeed in demonstrating unavailability, the statements are only admissible if they
> bear adequate indicia of reliability.  The indicia of reliability requirement is met if the
> statement fall within a 'firmly rooted hearsay exception' or contain particularized
> guarantees of trustworthiness.

*Bockting v. Bayer*, 505 F.3d 973, 978 (9th Cir. 2007) (citations and quotations omitted).  *Roberts*
held that out-of-court testimonial statements may be admitted as long as the witness is
unavailable and the statements have "adequate indicia of reliability," i.e., fall within a "firmly
rooted hearsay exception" or bear "particularized guarantees of trustworthiness."  488 U.S. at 66.

  Here, Jones's prior statement falls under California's exception for prior testimony, and
the appellate court's determination that Jones was "unavailable" was not unreasonable.  In
California, the exception for prior testimony is set forth in Cal. Evid. Code § 1291(a), which
allows admission of former testimony "if the declarant is unavailable as a witness and . . . [t]he
party against whom the former testimony is offered was a party to the action or proceeding in
which the testimony was given and had the right and opportunity to cross-examine the declarant
with an interest and motive similar to that which he has at the hearing."

  Under the law applicable to Carroll's case, testimony during a preliminary hearing may be
admitted at trial if the witness is "unavailable."  *See Terrovona v. Kincheloe*, 852 F.2d 424, 427
(9th Cir. 1988) (dead witness) (citations omitted); *Baker v. Morris*, 761 F.2d 1396 (9th Cir.
1985) (same).  This requires that the prosecutor make a *good faith effort* to obtain the witness'

19

presence.  *See Barber v. Page*, 390 U.S. 719, 724-25 (1968); *United States v. Olafson*, 213 F.3d

435, 441-42 (9th Cir. 2000) (good faith effort demonstrated where border patrol agents called

witness, who had been inadvertently returned to Mexico, but witness refused to return to testify);

*Windham v. Merkle*, 163 F.3d 1092, 1102 (9th Cir. 1998) (prosecutor made a good-faith effort to

locate witness where he subpoenaed witness, met with witness to discuss proposed testimony

after issuing subpoena, tried to call witness three times as trial date approached, contacted

witness's parole officer, had a bench warrant issued for witness's arrest, and assigned  a criminal

investigator to locate witness).

    In this case, the appellate court found that at a hearing on April 14, 1999, the trial court

properly determined that the prosecution had made reasonable efforts to secure Jones's presence

at trial.  Ex. C at 30.  On three separate occasions, an inspector from the Alameda District

Attorney's Office attempted to serve Jones at his mother's house.  *Id*.  On February 23, 1999,

when Jones's mother told the inspector that Jones was homeless and "might be living out of a

large gray American car with grill damage," an all-points bulletin was issued for Jones the same

day.  *Id*.  Additionally, the Department of Motor Vehicles was contacted for information about a

gray car, and a computerized listing was generated providing contacts throughout Alameda

County.  Ex. C at 31.  The inspector again met with Jones's mother, who the inspector believed

was not being totally cooperative, and asked her to contact Jones.  She said she would do so, but

she failed to make contact with Jones by the time the inspector spoke with her a week later.  Ex.

C at 31.  On March 22, 1999, an attempt was made to contact Jones's father, and a daily bulletin

was distributed to the Oakland Police Department and other law enforcement agencies.  Ex. C at

31.  On March 23, 1999, the inspector went to Jones's grandmother's house and spoke with

Jones's cousin.  The cousin indicated she had not seen Jones for a while and did not know where

he lived.  Ex. C at 31.  The inspector again spoke with Jones's mother on March 24, 1999.  At the

time she had no information regarding Jones's whereabouts.  On April 1, 1999, a visit was made

to an address believed to be that of Jones's father, although it was discovered that Jones's father

had moved from the address six months before.  The inspector then determined that Jones was

"not in custody in Contra Costa, San Mateo or Santa Clara counties.  His regular checks of the

20

computer systems did not reveal any arrests for Jones, and his contacts [the investigator's] with a number of hospitals revealed no patients with Jones's name." Ex. C at 32.

Carroll maintains that the prosecution was "dilatory in that it made no efforts to secure Jones' appearance at trial between the time of his preliminary hearing testimony on October 16, 1996, and Gadsey's [an Alameda County inspector] unsuccessful attempt to serve him with a subpoena on December 22, 1998." Ex. C at 32. Carroll contends that the search was not "timely begun." Ex. C at 32 (citing to *People v. Cromer*, 24 Cal.4th 889, 892 (2001) (a case in which the prosecution lost contact with the witness after the preliminary hearing and did not attempt to find her until months after the first trial date)).

The appellate court rejected this argument, noting that "[h]ere, there is no evidence the prosecution had reason to believe it would not be able to find Jones, or Jones would not be a cooperative witness, until it discovered in December 1998 that its information about Jones's address was no longer valid and learned from Jones's mother in January 1999 that Jones did not want to testify." Ex. C at 32. Additionally, the appellate court rejected Carroll's argument that if "an all points bulletin had been issued sooner, Jones could have been held after the February 5, 1999, disturbance at his mother's house in Hayward . . .[because] the Hayward police would have responded more quickly on February 5 and would have taken Jones into custody." Ex. C at 33. The appellate court found Carroll's argument to be entirely speculative, as there was no evidence that an all-points bulletin would have made the police respond faster, that Jones still would have been at his mother's house when the police arrived, or that arresting Jones on February 5 would have ensured his presence at trial two months later. Although the Penal Code permits material witnesses to be held in custody, such custody is subject to review every ten days, and it was unlikely Jones could have been held for two months. Ex C. at 33. The state appellate court's determination that the prosecution made a "good faith effort" to obtain Jones' presence and that the trial court correctly concluded that Jones was "unavailable" was not unreasonable. *See Barber*, 390 U.S. at 724-25.

Carroll nonetheless argues that his constitutional right to cross-examination was violated by the use of Jones's preliminary hearing testimony "because although they were able to cross-

examine Jones at a preliminary hearing, that hearing involved a lower standard of proof and there

was a 'presumption' that the witness would be available for trial and subject to the jury's

evaluation of his demeanor and credibility."  Ex. C at 36-37.  The state appellate court rejected

Carroll's argument as follows:

> This argument would suggest that preliminary hearing testimony can never be
> sufficient under Evidence Code section 1291 [which admits prior testimony if a
> witness is unavailable has given prior testimony subject to cross-examination by
> defendant] . . . While preliminary hearing testimony might not be admissible
> under Evidence Code section 1291 if the defense was precluded from conducting
> a full cross-examination . . . [Carroll] makes no claim that this was the case here.
> Defense counsel - the same counsel now representing [Carroll] here - cross-
> examined Jones about his prior offenses and statements to the police concerning
> those offenses, about the changes in his story to the police regarding the shooting,
> and about his conduct on the night of the shooting and inconsistencies in his
> account.

Ex. C at 37.

On habeas review, this Court may grant relief only if the state court decision was contrary

to, or an unreasonable application of, clearly established United States Supreme Court authority.

28 U.S.C. § 2254(d).  The Supreme Court has never held that a prior opportunity to cross-

examine must meet any particular standards - for example, that a defendant have the same right

and opportunity to cross-examine a witness at a preliminary hearing as at a trial - as Carroll

contends here.  Even if Carrroll could establish that his opportunity to cross-examine Jones at the

preliminary hearing was not the same as it would have been at trial, there is no "clearly

established" Supreme Court authority that would support habeas relief.

Carroll further argues that the admission of Jones's testimony denied him due process

because the testimony was "unreliable," Ex. C at 34, and "involuntary."  Ex. C at 37.  The

appellate court rejected both of these claims.  First, the appellate court acknowledged that while a

trial court must exclude witness testimony if a witness is incapable of understanding his duty to

tell the truth, it is also the duty of the aggrieved party to make a timely objection to the testimony.

Ex. C at 36.  Carroll failed to make such an objection, and the appellate court found nothing in

the record to support Carroll's claim that Jones was incapable of understanding his duty to tell the

truth.  Although it noted that "the credibility of Jones' statements would be open to great

question, given his changes of story, his history of criminal conduct and attempts to evade

1  responsibility for it . . ." it also concluded that these observations did not "bear on the

2  fundamental question of his competence to testify."  Ex. C at 36.

3          The appellate court also rejected Carroll's claim that Jones's testimony was involuntary

4  because he "completely changed his story during his police interview . . . the change occurr[ing]

5  after a brief break in the police interview during which Jones was accompanied by one officer

6  [Swisher] to get a drink of water."  Ex. C. at 37.  While Carroll argued that he was denied due

7  process because he did not have an opportunity for cross-examination regarding the voluntariness

8  of Jones's statement, the appellate court rejected this argument, pointing out that "Jones himself

9  was specifically questioned on this point [the voluntariness of his statement] at the preliminary

10 hearing and testified that Swisher did not say anything [in an effort to coerce a statement from

11 Jones] to him during the water break.  [Carroll] offer[s] no reason to suspect Jones'[s] testimony

12 would have been any different if he had been available for questioning at the hearing on the

13 voluntariness of his statement."  Ex. C at 38.

14         Because he has failed to establish that the trial court's decision was contrary to, or an

15 unreasonable application of federal law, or that it was based on an unreasonable determination of

16 the facts in light of the evidence presented in the state court proceeding, Carroll is not entitled to

17 relief on this claim.

18 C.      Inadmissible Testimony by Expert Witness

19         Carroll next alleges that the trial court should have declared a mistrial after the prosecutor

20 unnecessarily elicited an expert witness's testimony indicating that Carroll's fingerprints were

21 already in the police department files, testimony that Carroll argues led the jury to infer that he

22 had a criminal record.  Carroll argues that the prejudice from this alleged error was incurable and

23 deprived him of a fair trial.  Respondent contends that the reference to Carroll's fingerprint

24 exemplars was not unduly prejudicial.

25         A person in custody pursuant to the judgment of a state court may obtain a federal writ of

26 habeas corpus only on the ground that he is in custody in violation of the Constitution or laws or

27 treaties of the United States.  28 U.S.C. § 2254(a).  A state court's evidentiary ruling thus is not

28 subject to federal habeas review unless the ruling violates federal law, either by infringing upon a

1    specific federal constitutional or statutory provision or by depriving the defendant of the

2    fundamentally fair trial guaranteed by due process.  *See Pulley v. Harris*, 465 U.S. 37, 41 (1984);

3    *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991); *Middleton v. Cupp*, 768 F.2d

4    1083, 1085 (9th Cir. 1985).

5         Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis

6    for granting federal habeas relief on due process grounds.  *See Henry v. Kernan*,197 F.3d 1021,

7    1031 (9th Cir. 1999); *Jammal*, 926 F.2d at 919.  While adherence to state evidentiary rules

8    suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have

9    a fair trial even when state standards are violated; conversely, state procedural and evidentiary

10   rules may countenance processes that do not comport with fundamental fairness.  *See id*. (citing

11   *Perry v. Rushen*, 713 F.2d 1447, 1453 (9th Cir. 1983)).  The due process inquiry in federal

12   habeas review is whether the admission of evidence was arbitrary or so prejudicial that it

13   rendered the trial fundamentally unfair.  *See Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir.

14   1995); *Colley*, 784 F.2d at 990.  Only if there are no permissible inferences that the jury may

15   draw from the evidence will its admission violate due process.  *See Jammal*, 926 F.2d at 919-20

16   (admission of evidence that defendant carried large sums of cash in trunk of car is not type of

17   evidence which necessarily prevents fair trial; jury could draw rational inference that is not

18   constitutionally impermissible); *see also Rupe v. Wood*, 93 F.3d 1434, 1444 (9th Cir. 1996)

19   (evidence of defendant's gun collection did not violate due process where it was brief and non-

20   specific, was embedded in longer testimony on other matters, was not emphasized by the

21   prosecutor, was similar to evidence offered by the defendant in mitigation and was accompanied

22   by weighty evidence against the defendant); *Gordon v. Duran*, 895 F.2d 610, 613 (9th Cir. 1990)

23   (admission of uncharged crimes did not violate due process where trial court gave limiting

24   instruction to jury, jury was able to weigh witness' credibility and evidence was relevant to

25   defendant's intent).

26        At trial, the prosecution presented the testimony of Jennifer Hannaford, a criminalist at

27   the Oakland Police Department crime lab, and an expert in fingerprint comparison and

28   identification.  Hannaford testified that she examined fingerprints found on a rifle and boxes of

1    ammunition taken from the apartment of Carroll's co-defendant, Mouton.  Carroll's fingerprint

2    was found on the liquor box in Mouton's apartment.  Because Carroll's fingerprints were not

3    found on the rifle or boxes of ammunition, Hannaford was asked by the prosecution how she had

4    obtained fingerprint exemplars with which to compare Carroll's fingerprint.  Hannaford testified

5    that, "[w]e have exemplar prints from the Oakland Police Department and we just took them

6    from the files."  Ex. C at 40.

7         Carroll moved for a mistrial, claiming that Hannaford's statement was extremely

8    prejudicial because it allowed the jury to infer that Carroll and his co-defendants had prior

9    criminal contacts, probably arrests or convictions.  Carroll argues that Hannaford's statement was

10   so prejudicial that no cautionary instruction could have cured the harm stemming from the

11   testimony.  The state appellate court concluded that Hannaford's testimony was not incurably

12   prejudicial and upheld the trial court's decision to deny Carroll's motion for a mistrial.  In doing

13   so, the appellate court first noted that the trial court believed the alleged prejudicial inference of

14   prior arrests could be cured with a cautionary instruction to the jurors.  The trial court suggested

15   an instruction that would have directed the jurors not to be "influenced by any reference which

16   may have been made by a witness regarding any previous contact or record with any police

17   agency which may be been referred to by a - or any witness concerning a defendant, or something

18   like that . . . ."  Ex. C at 41.  However, believing that the limiting instruction would highlight that

19   aspect of Hannaford's testimony, defense counsel expressly objected to the proposed instruction

20   being given to the jury.  Accordingly, the trial court did not give the limiting instruction.  Ex. C

21   at 41.

22        The appellate court next addressed Carroll's argument that Hannaford's testimony was

23   extremely prejudicial, warranting a mistrial because it gave rise to an inference that Carroll had a

24   prior criminal record.  The court observed that:

25            There can be little doubt that Hannaford's testimony would support an inference
             that [Carroll] had criminal records of some sort: It is easy to imagine a juror
26           concluding that since Hannaford obtained the fingerprint exemplars from "police
             department files," [Carroll] must have at least been arrested in the past.  As the
27           prosecutor argued at trial, however, this is not the *only* inference a juror could
             have drawn from the testimony. . . .  Hannaford's remark was ambiguous; she did
28           not expressly testify that [Carroll] had, in fact, been charged with or convicted of

                                              25

1    crimes in the past.

2    Ex. C at 42.

3          Here, the trial court did not abuse its discretion in deciding that the testimony was not

4    incurably prejudicial and did not warrant a mistrial.  Carroll has failed to show that the admission

5    of Hannaford's testimony was so "fundamentally unfair" that it violated his due process rights.

6    *See Walters*, 45 F.3d at 1357.  Nor has Carroll shown that the jury could not have drawn any

7    permissible inferences from Hannaford's testimony.  *See Jammal*, 926 F.2d at 920.  Accordingly,

8    the state appellate court's decision was not contrary to, or an unreasonable application of federal

9    law, nor was it an unreasonable determination of the facts in light of the evidence presented in

10   the state court proceeding.

11   D.    <u>Cumulative Error</u>

12         Finally, Carroll argues that the cumulative effect of the alleged errors denied him a fair

13   trial.  *See Killian v. Poole*, 282 F.3d 1204, 1211 (9th Cir. 2002) (cumulative error doctrine

14   recognizes that, "even if no single error were prejudicial, where there are several substantial

15   errors, 'their cumulative effect may nevertheless be so prejudicial as to require reversal'" (quoting

16   *United States v. de Cruz*, 82 F.3d 856, 868 (9th Cir. 1996)).  Where no single constitutional error

17   is found, nothing can accumulate to the level of a constitutional violation.  *See Mancuso v.

18   Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002); *Fuller v. Roe*, 182 F.3d 699, 704 (9th Cir. 1999);

19   *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996).  For the reasons discussed above, this Court

20   concludes that Carroll has failed to show any constitutional errors.  *See United States v. Carreno*,

21   363 F.3d 883, 889 n.2 (9th Cir. 2004) (noting that the cumulative error doctrine does not apply

22   where there was no error).

23

24

25

26

27

28

Case No. C 05-0850 JF
ORDER DENYING PETITION FOR HABEAS CORPUS
(RSLC1)

1

## IV.  ORDER

2      Good cause therefore appearing, IT IS HEREBY ORDERED that Carroll's petition for a

3  writ of habeas corpus is DENIED.  The Clerk shall enter judgment to close the file.

4      IT IS SO ORDERED.

5

6  DATED:  8/19/08

7

8      _____

9      JEREMY FOGEL
       United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. C 05-0850 JF
ORDER DENYING PETITION FOR HABEAS CORPUS
(RSLC1)